**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| **FELICIA BELL CARTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL NO. 06-0151-WS-B** |
| | ) | |
| **UNIVERSITY OF SOUTH ALABAMA** | ) | |
| **CHILDREN'S & WOMEN'S HOSPITAL,** | ) | |
| *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on defendants' Motion for Summary Judgment (doc. 44). The Motion has been briefed and is ripe for disposition at this time.[1]

**I.    Background.[2]**

As set forth in the Amended Complaint (doc. 22), plaintiff Felicia Bell Carter brought this action against defendants University of South Alabama Children's & Women's Hospital (the "Hospital") and Mike Renka to pursue claims arising from alleged sexual harassment and retaliation during the course of her employment. The Amended Complaint asserts a cause of action for sexual harassment and sex discrimination against the Hospital under Title VII of the

---

[1]    Pursuant to Local Rule 7.1(b) and the applicable Rule 16(b) Scheduling Order (doc. 30), principal briefs are capped at 30 pages, and reply briefs are not to exceed 15 pages. Defendants have not sought leave to exceed these page limits, yet their principal brief extends to 31 pages and their reply brief to 16 pages. Moreover, those modest exceedances are misleading because defendants achieved them only by shrinking the font of their numerous footnotes smaller than the 12-point type mandated by Local Rule 5.1(a)(2). In its discretion, the Court will accept these nonconforming briefs; however, counsel are cautioned to adhere strictly to the Local Rules and Scheduling Order requirements in future submissions.

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11ᵗʰ Cir. 2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11ᵗʰ Cir. 2005). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), as well as three state-law claims for invasion of privacy, outrage and assault and battery against defendant Renka.[3]  Parallel state-law claims against the Hospital were dismissed via Order (doc. 27) dated June 1, 2006, pursuant to plaintiff's representation that she had no objection to such dismissal.

> ### A.    *Plaintiff's Interactions with Defendant Renka.*

Carter worked as a full-time registered nurse on the night shift in the pediatrics unit on the fifth floor of the Hospital from 1992 through 2004.  (Byrne Aff., ¶ 3; Carter Dep., at 57, 68, 70, 103.)  In this capacity, Carter had occasion to interact with defendant Renka, a pharmacist who had also worked the night shift at the Hospital for many years.  (Carter Dep., at 102.)  The pharmacists worked in the lower level / basement of the Hospital, but made rounds on the fifth floor at least once per shift.  (*Id.* at 103.)  Additionally, Carter would routinely walk to the pharmacy to pick up medications for patients.  (*Id.* at 103-04.)  On average, Carter spent less than 30 minutes of each 12-hour shift working around pharmacists.  (*Id.* at 104.)  The pharmacy itself consisted of a window and a secure area behind a locked door, which Carter never entered, and she always obtained whatever medications she needed from the window area.  (*Id.* at 104-05.)  Renka was "[a]lmost always" on duty during Carter's shifts.  (*Id.* at 105.)[4]

Plaintiff contends that Renka engaged in sexually harassing conduct towards her.  (Carter Dep., at 117.)[5]  Although Renka had worked in the same building and on the same shift as Carter for many years, it was only during the last five years of Carter's employment at the Hospital that

_____

[3]    Although the Amended Complaint does not expressly state a cause of action for retaliation under Title VII, defendants have extensively briefed and litigated the retaliation claim without objection to its presence in the lawsuit; therefore, that claim will be recognized by the Court as if it had been properly pleaded.  *See Steger v. General Elec. Co.*, 318 F.3d 1066, 1077 (11th Cir. 2003) ("issues not raised in the pleadings may be treated as if they were properly raised when they are tried by express or implied consent of the parties"); Rule 15(b), Fed.R.Civ.P.

[4]    As a pharmacist, Renka was not responsible in any way for supervising Carter's work, and lacked any authority to fire her, discipline her, evaluate her performance, or modify her job duties.  (Carter Dep., at 115-16.)

[5]    This allegation is isolated to Renka, as Carter admitted that she never had problems with anyone else at the Hospital that she felt rose to the level of sexual harassment. (*Id.*)

Renka became a problem.  (*Id.* at 110.)  Carter maintains that Renka began "bugging [her] and harassing [her]" to the point where she could not "go to the pharmacy in peace to get medicines." (*Id.* at 114.)  In Carter's view, Renka "made [her] surroundings intimidating" by conducting himself in a manner that she perceived as "perverted."  (*Id.*)  According to Carter, there were multiple occasions on which Renka invited her "[t]o come down to the pharmacy and spend time with him," telling her that "it will be just us and we could spend some time together," and suggesting that they "fool around."  (*Id.* at 108, 216.)  In response to such overtures, Carter told Renka that she was not interested in anything to do with him, that she was not coming, and that he should leave her alone.  (*Id.* at 108, 193.)  On another occasion, Renka invited Carter to "take an elevator ride" with him.  (*Id.* at 216.)  Beyond those comments, Renka never made any statements to Carter that she deemed sexually offensive.[6]

Furthermore, Carter contends that Renka engaged in offensive written communication to her.  Sometime in the months before October 2004, Renka handed Carter a note that read, "When do I get to massage the front?"  (Carter Dep., at 217-18 & Exh. 55.)  Carter also testified that Renka had given her another note (which she was unable to locate during this lawsuit) that specifically referenced Carter's "boobs".  (*Id.* at 221.)

An additional form of conduct by Renka cited by Carter as a basis for her lawsuit was his practice of leaving "little brown bags" of candy in her work area for her from time to time. (Carter Dep., at 191; Renka Dep., at 15.)  Renka would draw little smiley faces on the top of the bags.  (Renka Dep., at 17.)  On occasion, Carter would tell him that she did not want the candy, but he would say nothing in response and simply leave the candy for her.  (Carter Dep., at 192.)

With regard to physical contact, Renka never kissed Carter, was physically violent towards her, or attempted to touch her inside her clothing.  (Carter Dep., at 112.)  That said, however, the centerpiece of Carter's Complaint is a contention that Renka inappropriately rubbed against her on October 13, 2004.  At approximately 5:00 a.m., Carter testified, she was standing in the hallway talking to her nursing supervisor, Cathy Barrott, on the telephone when

---

[6]     More specifically, Renka never asked her out on dates, asked her about her sex life, inquired about her sexual preferences, asked about her personal life, or indicated that he wanted to meet her outside of work.  (*Id.* at 111-13.)  He never called her vulgar names or told jokes that she found inappropriate.  (*Id.* at 216-17.)

Renka walked by, rubbing his midsection against her buttocks for several seconds as he did so. (*Id.* at 187.)  In describing this incident, Carter unequivocally stated that "[i]t was not a bump.  It was an actual rub against my butt."  (*Id.*)  Renka did not speak as he rubbed up against Carter, but quickly moved around towards the elevator.  (*Id.* at 188.)  This occasion marked the first time that Renka had ever touched her.  (*Id.* at 190-91, 216.)[7]  Carter was so taken aback that she abruptly exclaimed "What the hell?" in the middle of her telephone conversation.  (*Id.* at 188.)  As Barrott clearly heard Carter's outburst, she asked what was going on, prompting Carter to inform Barrott what had just transpired.  Barrott's response was that she too had had problems with Renka.  (*Id.* at 189.)[8]  Following this incident, Carter was able to complete her shift, but she

---

[7]         In opposition to defendants' motion, plaintiff tries to contradict her own testimony on this point by relying on Renka's testimony that once he had rubbed her shoulders. (Renka Dep., at 20-21.)  The law in this Circuit is clear, however, that plaintiff does not get to pick and choose which parts of her testimony she wants the Court to accept, and which she would prefer to supplant with other, more favorable record evidence.  *See Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (*en banc*) ("When the nonmovant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant.  Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*.").  For that reason, Carter is constrained by her account that Renka had never touched her previously, and cannot rely on any testimony by Renka to the contrary.  The same result attaches to plaintiff's attempted reliance on Renka's testimony that he "[s]ometimes" told off-color or dirty jokes in her presence.  (Renka Dep., at 13.)  Given Carter's clear testimony that Renka had never told any jokes in her presence that she considered inappropriate (Carter Dep., at 217), plaintiff cannot utilize Renka's testimony to bolster her case by contradicting her own version of the facts.

[8]         To rebut Carter's testimony on this point, defendants cite Barrott's sworn statement that she "immediately directed [Carter] to report the incident to Personnel."  (Barrott Aff., ¶ 3.)  Of course, the evidence on summary judgment must be taken in the light most favorable to the nonmovant.  At this stage, this Court cannot select between conflicting evidentiary submissions by deciding the witnesses' respective credibility, but must instead credit Carter's account.  Inasmuch as Carter unequivocally disputed Barrott's statement that Barrott had advised Carter to initiate a formal complaint, Barrott's affidavit cannot be credited on this point.  (Carter Dep., at 189.)

-4-

was "angry" and felt "infringed upon" and "disgust[ed]".  (*Id.* at 189-90.)[9]  Although he did not apologize, Renka engaged in no further conduct of a sexual nature towards Carter after this October 2004 incident.  (*Id.* at 25, 224.)

       **B.**      **The October 2004 Complaint.**

      During the course of her employment at the Hospital, Carter received University of South Alabama ("USA") staff employee handbooks on multiple occasions between 1992 and 2004. (Carter Dep., at 52-53 & Exh. 2.)[10]  Carter understood that she was responsible for familiarizing herself with the policies set forth in those handbooks.  (*Id.* at 55.)  The staff handbook includes a specific provision addressing sexual harassment and reciting the following components of the policy: (a) a prohibition on sexual harassment, as defined in the handbook; (b) a statement that any employee who believes that she has been the victim of sexual harassment should report the conduct immediately to any of various USA officials; (c) a statement that internal complaints would be investigated thoroughly and appropriate action taken; and (d) a prohibition on retaliation against any employee for making a sexual harassment complaint.  (Byrne Aff., ¶ 6 &

---

[9]      Once again, defendants offer evidence contrary to Carter's version of the October 13 incident, and implicitly urge the Court to adopt same.  (Defendants' Brief, at 6.)  In this respect, defendants point to Renka's testimony that he had merely "bumped into her as a means of a friendly hello instead of saying anything," and that it was his whole body, rather than his pelvic region, that "bumped" her.  (Renka Dep., at 22-23.)  As already stated, for summary judgment purposes, the Court credits Carter's deposition testimony in its entirety, and cannot credit defendants' conflicting evidence.  That Renka may recall these events differently than Carter may prove highly significant at trial; however, it is devoid of legal significance for purposes of the instant Motion for Summary Judgment.

[10]      Exhibit 2 to plaintiff's deposition includes no fewer than five handbook receipts that purport to contain her signature.  It appears that defense counsel asked Carter about those receipts in her deposition; unfortunately, the excerpted deposition pages omit any discussion that might authenticate those receipts.  Notwithstanding this omission, as it appears that these exhibits can be reduced to admissible form at trial, they will be considered on summary judgment.  *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form."); *U.S. Aviation Underwriters, Inc. v. Yellow Freight System, Inc.*, 296 F. Supp.2d 1322, 1327 n. 2 (S.D. Ala. 2003) ("Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that those documents can be reduced to admissible, authenticated form at trial.").

Exh. 2, § 5.16.)[11]

On October 25, 2004, Carter submitted an internal written complaint of sexual harassment by Renka to her nurse manager, Tracy Shannon.  (Shannon Aff., ¶ 3 & Exh. 1.)  This missive marked the first time that plaintiff had ever complained to Hospital officials about sexual harassment or about Renka.  (Carter Dep., at 182-83; Shannon Aff., ¶ 4; Buerger Aff., ¶ 5.)  The letter was couched as a formal complaint of sexual harassment, reciting both the October 13 physical contact and Renka's history of offensive oral and written comments.  (Shannon Aff., at Exh. 1.)  Upon submitting her complaint, plaintiff (who appeared annoyed, rather than distraught or hysterical) advised Shannon that she believed Renka's actions on October 13 had been intentional.  (*Id.*, ¶ 3.)  Shannon promptly referred the complaint to Personnel.  (*Id.*)[12]

On October 26, 2004, Carter approached Paula Buerger, USA's Equal Opportunity and Affirmative Action Manager, with her concerns that Renka had sexually harassed her.  (Buerger Aff., ¶¶ 2-3.)  Buerger promptly conducted an investigation in which she interviewed Carter, Renka, and Barrott.  (*Id.*, ¶¶ 6-16 & Exh.1.)  By November 2, 2004, Buerger concluded the investigation and determined that, while Renka had engaged in unprofessional and immature behavior, it did not rise to the level of severe and pervasive harassment.  (*Id.*, ¶ 4.)  Nonetheless, Buerger admonished Renka that further incidents could lead to discipline, up to and including termination of employment, and counseled him about the Hospital's prohibition on both harassing and retaliatory conduct.  (*Id.*, ¶¶ 17-19.)  Buerger received no further complaints from Carter concerning inappropriate conduct by Renka.  (*Id.*, ¶ 20.)  Indeed, plaintiff concedes that there was no further harassing conduct from Renka after she complained to the Hospital and that the October 13 physical contact marked the final incident of harassment.  (Carter Dep., at 224.)

---

[11]    The handbook sections appended to the Byrne Affidavit are undated, so it is unclear whether this iteration of the sexual harassment policy (or something like it) was in effect at times relevant to this dispute.

[12]    Somewhere in this time frame, Carter also notified Tracie Byrne in the Hospital's human resources office of her concerns.  (Byrne Aff., ¶ 11.)  Byrne advised Carter to bring the matter to her supervisor's attention, and also reminded her that she could contact USA's Equal Opportunity and Affirmative Action Manager to pursue her complaint if she wished to do so. (*Id.*, ¶ 13.)

### C.    *Plaintiff's Employment History in and after October 2004.*

#### 1.    *Plaintiff's October 2004 Application to Knollwood.*

On October 20, 2004, five days before she lodged her internal sexual harassment complaint, Carter completed an application for a part-time nursing position in long-term acute care at Knollwood Hospital ("Knollwood"), a sister hospital of Children's & Women's in the USA system.  (Byrne Aff., ¶¶ 4-5 & Exh. 1; Carter Dep., at 61, 65.)[13]  In her deposition, Carter explained that she was attracted to the Knollwood position because of "the interest of the job itself and that particular type of patients," which included adult, ventilator-dependent patients. (Carter Dep., at 65.)  As she put it, her application was motivated by "just a desire to do something different," and the Knollwood work would be challenging, new and different.  (*Id.* at 66, 68.)  At the time that Carter applied for the Knollwood job, no one at the Hospital had told her that she should seek work elsewhere or that her job was in jeopardy; rather, the application was entirely voluntary on her part.  (*Id.* at 61.)  Knollwood hired her for the part-time nursing job, effective November 12, 2004.  (Byrne Aff., ¶ 7.)  As a result, on October 29, 2004, plaintiff tendered written notice to Children's & Women's, explaining that she was resigning and that she had accepted the Knollwood position "[d]ue to circumstances beyond [her] control."  (Carter Dep., at 90 & Exh. 10.)[14]  Plaintiff acknowledges, however, that she could have continued working at Children's & Women's in the same job with the same hours had she wished to do so; therefore, the record cannot support an inference that she was forced out of her job.  (*Id.* at 229.)

#### 2.    *Plaintiff's January 2005 Application to Children's & Women's.*

Within three months after her arrival at Knollwood, Carter reapplied for a full-time nursing vacancy at Children's & Women's because she "realized that [she] really missed

---

[13]    The record is clear that Knollwood and Children's & Women's are both bodies within the USA health care system, and that Carter remained employed by USA irrespective of which of the two hospitals she was working for.  (Carter Dep., at 85.)

[14]    Although plaintiff now insinuates that those circumstances beyond her control were the Renka harassment issue, it is undisputed that she never articulated a desire to be transferred in her dealings with Buerger or anyone else at USA relating to her sexual harassment complaint.  (Buerger Aff., ¶ 7; Shannon Aff., ¶ 6.)  In any event, she applied for the Knollwood job without first affording the Hospital an opportunity to correct the problem by initiating a complaint against Renka.

working with the children and had a desire to go back to that." (Carter Dep., at 80.) In reapplying to Children's & Women's, Carter acted voluntarily and of her own free will. (*Id.* at 85.) Carter's application for a full-time nursing position at Children's & Women's was submitted on January 20, 2005. (Byrne Aff., ¶ 15.) This position was in an adolescent unit as to which Joyce Palmer was the nurse manager. (Palmer Aff., ¶¶ 2, 5.) Palmer interviewed Carter and five other applicants. (*Id.*, ¶ 6.) Some time prior to that interview, Palmer told Carter "please come back" to work at Children's & Women's and stated "that she wasn't winning the battle there and she could use the help, for [Carter] to come back." (Carter Dep., at 97-98.) Indeed, Carter's testimony is that Palmer virtually guaranteed her the job before the interview, entreating her to "[p]lease come back. I'll call personnel and tell them that you're coming." (*Id.* at 227.) During the interview, however, Palmer explicitly noted the existence of Carter's sexual harassment complaint against Renka and asked Carter what had become of it. (*Id.* at 205-06; Palmer Aff., ¶ 7.)[15] Carter told her that nothing had happened and that no one had ever gotten back to her about her complaint. (Carter Dep., at 208.)

In an abrupt about-face of her pre-interview communications, Palmer did not hire Carter for the vacant position in February 2005. Palmer explains that she "decided that Felicia was just not appropriate for this position," based on information in her file and Palmer's own personal experiences with her. (Palmer Aff., ¶ 9.) According to Palmer, Carter's personnel file "just

---

[15]     Palmer attempts to minimize this line of questioning as being innocuous, stemming from her concern about Carter and Renka working together and her status as "very new" in her position, and being a product of her uncertainty as to whether Carter deserved "special consideration" because of her complaint. (Palmer Aff., ¶¶ 7-8.) This explanation contradicts Carter's testimony that the subject of whether Carter would have any trepidation or unease about working around Renka was never discussed during the interview. (Carter Dep., at 206-07.) Moreover, Palmer's admitted uncertainty as to whether the internal complaint did warrant "special consideration" of Carter's job application can be construed in multiple ways. Palmer is adamant that the information she solicited from Carter about the status of her internal complaint against Renka did not factor into her hiring decision. (Palmer Aff., ¶ 8.) Of course, this kind of self-serving blanket denial need not be credited on summary judgment if plaintiff's facts support a reasonable inference to the contrary; otherwise plaintiffs would never survive summary judgment in Title VII cases because defendants could guarantee victory simply by uttering a few magic words in their summary judgment filings, irrespective of the underlying conduct and facts.

raised too many red flags" because it included comments about her absenteeism, tardiness, lack of professionalism, poor attitude, and the like, all of which prompted Palmer to conclude that "there was a bad pattern with Felicia that looked like it would not change." (*Id.*, ¶ 10.)[16] Palmer further explained that these conclusions were reinforced by her own observations of Carter when Palmer was a nursing supervisor on the 3 p.m. to 11 p.m. shift between 2002 and 2004. (*Id.*, ¶¶ 3, 11.) Palmer indicated that she had personally witnessed incidents in which Carter "had acted inappropriately toward parents or was complained about by parents," but that she and other managers had consciously chosen to overlook those concerns "because we all agreed that her clinical skills were just fine." (*Id.*, ¶ 11.) In lieu of hiring Carter, Palmer selected a "a new graduate RN who was known to another employee working the fourth floor." (*Id.*, ¶ 13.) The successful applicant was hired into that position on June 6, 2005. (*Id.*, ¶ 12.)

### 3. *Plaintiff's Employment History Post-January 2005.*

The record reflects that Carter applied for additional jobs within the USA medical system in March 2005 and December 2005; however, plaintiff's pleadings, discovery responses, EEOC filings and briefs all demonstrate that those personnel decisions are not at issue in this litigation. *See* Plaintiff's Brief (doc. 48), at 1, 4-6 (mentioning only February 2005 hiring decision as basis for retaliation cause of action); Plaintiff's Interrogatory Responses, at #9 (similar); First Amended Complaint (doc. 22), ¶ 12 (similar). Accordingly, notwithstanding defendants' affidavits and other evidentiary submissions relating to the March 2005 and December 2005 employment applications, those hiring decisions are beyond the scope of these proceedings and have not been joined as triable issues herein. Therefore, it suffices to point out that Carter remains employed in the USA medical system today, working at USA Medical Center as a

---

[16]     Few of the personnel documents on which Palmer relied in making this statement were of recent vintage. In particular, she pointed to a 1999 performance evaluation referencing attendance and attitude issues, a 2000 evaluation referencing attendance issues, attendance writeups from 1994 and 1999, writeups from 1995 and 1996 regarding parental complaints, and a 1999 writeup concerning rudeness to a manager. (Palmer Aff., at Exh. 1.) The only personnel documents in the sheaf provided by Palmer that had occurred within four years of the job interview were (a) a March 2004 verbal warning for tardiness; and (b) a September 2001 "patient concern form" documenting one patient's dissatisfaction with Carter. (Palmer Aff., at Exh. 1.) Palmer does not identify any information from any of plaintiff's performance appraisals from the 2001-2004 time period as influencing her decision in any way.

registered nurse in the medical/surgery unit.  (Carter Dep., at 58.)

## II.     Legal Standard for Summary Judgment.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  *Id.* at 1086 (citation omitted).

## III.    Plaintiff's Claims against the Hospital.

Pursuant to the parties' implied consent, Carter's claims against the Hospital consist of a Title VII claim for sexual harassment and sex discrimination based on the conduct of defendant Renka, and a Title VII claim for retaliation relating to the January 2005 employment application.  Each of those causes of action will be addressed in turn.

### A.     Title VII Sexual Harassment / Sex Discrimination Claim.

A plaintiff may not sue under Title VII unless she first exhausts administrative remedies

by filing a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001).  In a non-deferral state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act.  *See Ledbetter v. Goodyear Tire and Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir. 2005) (explaining that Alabama is a non-deferral state, such that only unlawful practices occurring within 180 days of the operative EEOC charge can give rise to Title VII liability).  "If the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to treat the unlawful practice as if it were lawful."  *City of Hialeah v. Rojas*, 311 F.3d 1096, 1102 (11th Cir. 2002).  In the hostile environment context, allegations outside the statutory time period may permissibly be considered only if at least one act contributing to the hostile environment took place within the applicable statutory time frame.  *See Ledbetter*, 421 F.3d at 1179.

The Hospital correctly maintains that Carter failed to satisfy this threshold 180-day filing requirement with respect to her sexual harassment / sex discrimination claim.  Indeed, plaintiff's own testimony establishes that the final instance of alleged sexual harassment by Renka occurred on October 13, 2004, such that the 180-day EEOC filing clock must have commenced ticking no later than that date.  The record further reflects that Carter did not file her EEOC charge of discrimination until Tuesday, April 12, 2005.  (Carter Dep., at Exh. 49, 50, 52.)  As plaintiff's charge was filed 181 days after the last incident of underlying harassment, that charge was untimely, and plaintiff's sexual harassment / sex discrimination claims against the Hospital must therefore be dismissed for failure timely to exhaust her administrative remedies.  *See, e.g., Wilkerson*, 270 F.3d at 1317 ("Before a potential plaintiff may sue for discrimination under Title VII, she must first exhaust her administrative remedies.").[17]

Faced with the inescapable arithmetic that her EEOC charge was untimely as to the sexual harassment claim, Carter proffers no basis for equitably tolling or otherwise circumventing the 180-day filing deadline.  Instead, Carter candidly concedes that her Title VII

---

[17]     Indeed, the EEOC specifically refused to consider the merits of Carter's charge of sexual harassment on the grounds that "it was determined that the Charging Party's sexual harassment claim is untimely and the agency lacks jurisdiction."  (Carter Dep., at Exh. 52.)

claim of sexual harassment against the Hospital is untimely.  (Plaintiff's Brief, at 4.)[18]

Under the circumstances, there can be no doubt that Carter's Title VII sexual harassment claim against the Hospital is barred for failure timely to exhaust administrative remedies.  On that basis, defendant's Motion for Summary Judgment is **granted** with respect to the sexual harassment / sex discrimination claim embodied in the First Cause of Action.

### B.    *Title VII Retaliation Claim.*

#### 1.    *Applicable Legal Standard.*

Title VII bars an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); *see Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) ("Retaliation is a separate violation of Title VII.").[19]  In the absence of direct evidence, Title VII retaliation claims turn on the same *McDonnell Douglas* burden-shifting analysis as do other Title VII claims.  *See Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).  Thus, a plaintiff bears the burden of establishing a *prima facie* case of retaliation by showing that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal link between her protected

---

[18]    Given the obvious limitations defect in this claim, the fact that the EEOC apprised the plaintiff of that problem at least as early as December 2005, and the plaintiff's lack of any colorable ground for overcoming that shortcoming, one might question why plaintiff ever brought her Title VII sexual harassment claim.  She readily admits that such a cause of action is untimely, and the record shows that she had actual knowledge of this fatal flaw before she commenced this lawsuit.  Under the circumstances, it would have served the interests of efficiency, judicial economy, and sensible allocation of the parties' scarce litigation resources for plaintiff to have refrained from injecting an obviously doomed cause of action into these proceedings or to have withdrawn the claim when its weaknesses became clear, rather than waiting until the eve of trial to capitulate to such a glaring flaw.  As it stands, the Hospital was obliged to perform extensive summary judgment briefing addressing the merits of a sexual harassment claim that was clearly time-barred, such that plaintiff's pleading needlessly diverted resources from the heart of the action to address a claim that cannot possibly succeed.

[19]    *See also Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) ("retaliation is a separate offense under Title VII; an employee need not prove the underlying claim of discrimination for the retaliation claim to succeed").

-12-

activity and the adverse action.  *See Crawford v. City of Fairburn, Ga.*, --- F.3d ----, 2007 WL 519061, *3 (11th Cir. Feb. 21, 2007); *Stavropoulos v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002).  If a plaintiff makes a *prima facie* showing, then the employer must articulate a legitimate, non-retaliatory reason for the challenged decision.  *See Brochu*, 304 F.3d at 1155; *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  If the employer produces legitimate reasons for the adverse employment action, then the plaintiff must show that these stated reasons are pretextual.  *See Brochu*, 304 F.3d at 1155.  Of course, the ultimate burden rests on the plaintiff to show that the employer's stated reason is a pretext for unlawful retaliation.  *See Pennington*, 261 F.3d at 1266.

> 2.      *Plaintiff's* Prima Facie *Case.*

In seeking summary judgment on the Title VII retaliation cause of action, the Hospital maintains that Carter cannot establish the requisite *prima facie* case.[20]  The Hospital does not suggest that plaintiff cannot satisfy the protected activity element, nor could it reasonably have so argued, given the clear Eleventh Circuit precedent declaring that internal complaints of sexual harassment such as those made by Carter constitute statutorily protected expression under Title VII.  *See, e.g., Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) ("[s]tatutorily protected expression includes internal complaints of sexual harassment to superiors").[21]  Rather, defendant's summary judgment arguments focus on the adverse employment action and causal link elements of the *prima facie* test.

In its principal brief, the Hospital does not suggest that plaintiff's claim of retaliation predicated on the February 2005 hiring decision fails to satisfy the "adverse employment action" requirement; however, its reply brief devotes almost 4 pages to crafting such an argument.  The

---

[20]      The Court's analysis on this point proceeds in recognition of the well-established principle that Carter's burden of establishing a *prima facie* case is not heavy.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one").

[21]      *See also Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) ("Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment."); *Gupta*, 212 F.3d at 587 (district court correctly instructed jury that internal complaint of sexual harassment and filing of EEOC charge were activities protected by Title VII).

Court declines to consider new grounds for summary judgment raised for the first time in a reply brief. Such issues are not properly before it where, as here, they could and should have been presented previously and the movant has offered no explanation for the delay. *See, e.g.*, *United States v. Gericare Medical Supply Inc.*, 2000 WL 33156443, *10 (S.D. Ala. Dec. 11, 2000) (declining to consider movant's argument in reply brief that exceeds scope of motion to dismiss, as such an argument is not properly before the court); *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F. Supp. 1511, 1515 (S.D. Fla. 1996) ("the Court finds that the movant may not raise new arguments in a reply brief"); *United States v. Feinberg*, 89 F.3d 333, 341 (7th Cir. 1996) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court.").[22]

Even if defendants had challenged the adverse employment action element in a timely fashion, Carter has adequately shown its existence. To be sure, "not every unkind act is sufficiently adverse" to qualify as an adverse employment action and support a retaliation claim. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1181 (11th Cir. 2003) (citation omitted); *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001) ("not all conduct by an employer negatively affecting an employee constitutes adverse employment action" for Title VII purposes). Rather, an employment action meets this threshold only when it "results in some tangible, negative effect on the plaintiff's employment" through "a serious and material change in the terms, conditions or privileges of employment ... as viewed by a reasonable person in the circumstances." *Shotz*, 344 F.3d at 1181-82 (citations omitted); *see also Bass v. Board of County Com'ers, Orange County, Fla.*, 256 F.3d 1095, 1118 (11th Cir. 2001) (explaining that

---

[22]    The logic animating this restriction is underscored by defendants' own briefing tactics in this case. Having failed to suggest in their initial brief that the February 2005 hiring decision is not an adverse employment action for retaliation purposes, defendants' reply brief then faults plaintiff's brief for failing to address that prong of the *prima facie* case of her own accord. (Reply Brief, at 5 n.5.) But plaintiff can hardly be rebuked for failing to brief an issue that it had no reason to believe was even in dispute based on defendants' omission of same in their principal brief. More to the point, it would confer an unfair advantage to permit defendants to omit a key argument until it's too late for plaintiff to respond, then unveil that argument and criticize plaintiff for not countering it anticipatorily. A nonmovant is not required to guess and offer preemptive rebuttals of arguments that the movant might make in its reply brief but that it neglected to mention in its principal brief.

"some threshold level of substantiality" must be satisfied for conduct to constitute an adverse employment action, inasmuch as not everything that makes an employee unhappy is actionable). The Eleventh Circuit has held that to show an "adverse employment action" for Title VII purposes, "the employer's action must impact the terms, conditions or privileges of the plaintiff's job in a real and demonstrable way," and that a plaintiff must show that a reasonable person in the circumstances would have viewed it as "a ***serious and material*** change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239.[23]

Here, Carter applied for a new job in January 2005. This position was in a different unit, in a different facility, and was a full-time position as compared to the part-time position that she then held. The Hospital denied her application for that new and different position. Such a rejection is unquestionably an actionable adverse employment action with a serious and material impact on Carter's terms, conditions or privileges of employment. Stated differently, a reasonable person in the circumstances would have viewed the denial of an application for a different position in the organization with greater work hours and performing different categories of work in a different facility as materially adverse, such that it might have dissuaded a reasonable person from making or supporting a charge of discrimination. *See generally Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2416-17, 165 L.Ed.2d 345

---

[23]     Last year, the Supreme Court weighed in on Title VII's retaliation standard. In *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the Supreme Court opined that Title VII's antiretaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." 126 S.Ct. at 2414. The appropriate standard is that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Although the Eleventh Circuit has not had occasion to rule definitively on *White*'s impact on existing Circuit precedent, it appears that *White* is not perfectly aligned with *Davis* and its progeny because, for example, the Supreme Court found in *White* that Title VII's retaliation clause "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 2412-13; *see also Moore v. ITT Technical Institute*, 2007 WL 460830, *1 (11th Cir. Feb. 13, 2007) (recognizing that *White* calls into question the continuing validity of the Eleventh Circuit's formulation of the *prima facie* case of retaliation). Nonetheless, the Court need not explore this topic further because any distinctions that might exist between *White* and the prevailing Eleventh Circuit rule antecedent to *White* would have no effect on the outcome reached herein.

(2006) (determining that reassignment of job duties may be actionable as Title VII retaliation if a reasonable employee in the circumstances would have found that reassignment of responsibilities to be materially adverse).[24]

Defendants also insist that plaintiff is unable to meet the "causal connection" prong of the *prima facie* showing of Title VII retaliation. "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta*, 212 F.3d at 590 (citation omitted). According to defendants, plaintiff cannot satisfy this requirement because "[o]ther than speculation ..., she has no evidence to link her complaint with Ms. Palmer's decision not to hire her." (Defendants' Brief, at 26.) This characterization of the record is inaccurate. Plaintiff's evidence is that, after essentially promising her the job, Palmer inquired about the status of Carter's sexual harassment complaint against Renka during a later job interview.

─────────────────────────

[24]     In challenging this element, defendants liken this adverse action to a mere denial of a request for shift change. But denial of a shift-change request may constitute adverse action in certain circumstances. *See Taylor v. Roche*, 2006 WL 2613659, *3 (11th Cir. Sept. 12, 2006) ("Taylor's supervisor's repeated refusal to transfer Taylor to the night shift constituted an adverse employment action."). Even were that not the case, Carter's application to Children's & Women's went far beyond merely asking to work a different shift. She was asking to move from part-time to full-time work, to move to a different practice area, and indeed to move to a different hospital altogether. As such, Carter's request was a far cry from simply asking to swap shifts, and defendants' case citations are inapposite. Likewise, defendants' contention that "a return to a full-time position at Children's & Women's Hospital would have been subjectively materially adverse for her, since, after applying at Children's & Women's, she consistently sought part-time jobs" (Reply Brief, at 5 n.5) borders on the absurd. Defendants would have the Court find that Carter was trying to sabotage herself by applying for a full-time job when she had stated months earlier that she subjectively wanted to work a part-time job. But subjective work preferences are not an ever-fixed mark that look upon tempests and are never shaken, but instead may change over time. Whatever her preferences might have been at other times, there is no evidence that Carter did not subjectively want to return to full-time work at Children's & Women's in January 2005, and there is abundant evidence to the contrary. Besides, all of this talk of subjective preferences is irrelevant to the adverse employment action inquiry. *See White*, 126 S.Ct. at 2415 ("We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective."); *Davis*, 245 F.3d at 1239 ("the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances").

-16-

Palmer's inappropriate inquiry about the status of Carter's internal complaint during a job interview, and the sudden reversal of her stance toward hiring Carter following that interview, strongly suggests that the harassment complaint and Palmer's decision not to hire Carter "were not wholly unrelated."  On that basis, plaintiff has plainly satisfied the low threshold necessary to establish the causal connection element of her *prima facie* case.[25]

<em>3.   The Hospital's Legitimate Nonretaliatory Reason.</em>

Carter having made a *prima facie* showing of retaliation under Title VII, it becomes incumbent on the Hospital to articulate legitimate nonretaliatory reasons for not hiring her in February 2005.  To shoulder this burden, the Hospital presents the affidavit of Joyce Palmer, the decisionmaker.  Palmer avers that her non-selection of Carter was based on various negative information in her personnel file (relating to absenteeism, professionalism, and the like) as well as her own personal experiences of inappropriate behavior by Carter in dealing with parents.

---

[25]   Defendants' grab-bag of counterarguments on this point are not persuasive.  First, defendants contend that any link between Carter's complaint and Palmer's hiring decision is mere "speculation"; however, it is fact that Palmer brought up the complaint during the job interview, and it is a reasonable inference that an interviewer would not ask a substantive question during an interview unless that question bore some relevance to the hiring decision at hand.  Surely, it is not speculation to conclude that the questions an interviewer asks during a job interview are not completely unrelated to that interviewer's hiring decision.  Next, defendants argue that Palmer could not possibly have changed her mind on her hiring decision based on the sexual harassment complaint because the record shows that Palmer knew of this complaint as far back as November 2004.  (Reply Brief, at 6 n.6.)  Contrary to defendants' assertion, however, the Palmer Affidavit does not reflect when, in relation to the job interview, she first learned of the Carter complaint, but instead contains a vague statement that Palmer became aware of it when she was transitioning into her nurse manager role.  (Palmer Aff., ¶ 4.)  By all appearances, Palmer was still "transitioning" when the interview took place, particularly given her protestation that she was "very new in this position" at that time.  (*Id.*, ¶ 8.)  The record does not reveal when Palmer learned of the sexual harassment complaint, and one reasonable inference is that she changed her tune on hiring Carter only after learning that Carter had complained about Renka.  Finally, defendants' reliance on the temporal proximity cases is misguided.  It is true that, "[f]or purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated."  *Gupta*, 212 F.3d at 590; *see also Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) ("By itself, the three month period between [the protected expression and the adverse action] does not allow a reasonable inference of a causal relation between the protected expression and the adverse action.").  But a close temporal proximity is not the only means of showing a causal connection, nor does a four-month gap somehow undermine other specific evidence of a causal nexus.

-17-

(Palmer Aff., ¶¶ 9-12.)  Such a showing is plainly adequate to satisfy the employer's modest burden of production, and plaintiff does not suggest otherwise.  *See Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769-70 (11th Cir. 2005) (employer's burden is exceedingly light, and is satisfied as long as employer articulates clear and reasonably specific non-discriminatory basis for its actions).

>    4.    *Pretext.*

Carter having made the requisite *prima facie* showing, and the Hospital having identified a legitimate nonretaliatory reason for the challenged action, the viability of plaintiff's Title VII retaliation claim hinges on her ability to demonstrate sufficient evidence of pretext.  To create a genuine issue of material fact on the question of pretext, Carter must "demonstrate that the proffered reason was not the true reason for the employment decision."  *Jackson v. State of Alabama State Tenure Com'n*, 405 F.3d 1276, 1289 (11th Cir. 2005).  She may do that "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.* Carter has opted for the latter approach; therefore, in order for this claim to withstand summary judgment, her evidence "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."  *Vessels*, 408 F.3d 763, 771 (11th Cir. 2005) (citations omitted).

Review of the record reveals numerous weaknesses and implausibilities in Palmer's stated reasons for her conduct and decisions.  The mere fact that Palmer asked Carter in a formal job interview about the status of her internal sexual harassment complaint raises a reasonable inference that Palmer was influenced by the existence of that complaint in her decisionmaking process.[26]  Palmer's explanation for why she asked Carter about the internal complaint is

---

[26]    Defendants rely on *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001) for the proposition that an interviewer's remarks about the plaintiff's previous bias allegations are not evidence of retaliatory animus.  But *Pennington* is obviously distinguishable. In *Pennington*, the employer reinterviewed the plaintiff after determining that a selection process conducted previously had been retaliatory against the plaintiff for having requested religious accommodation.  During that second interview, the employer explained to the plaintiff that this process was being conducted "to make sure that [plaintiff] did not receive any retaliation for his

unsatisfying, and may or may not be deemed credible by a reasonable finder of fact.  Palmer says she raised this subject because she was "somewhat concerned about whether [Carter] would desire to return to work on the same shift as Mike Renka." (Palmer Aff., ¶ 7.)  But Carter emphatically denies that Palmer ever asked her about her willingness or ability to work on the same shift as Renka.  (Carter Dep., at 206-07.)  Besides, if this were Palmer's concern, a much more logical way of framing the question would have been to ask whether Carter felt comfortable working around other night shift workers, and whether she had any reservations in that regard.  As it was, Palmer's stated reason for asking the question does not mesh with the form of the question asked, because asking the status of Carter's complaint would not reasonably elicit information as to whether Carter had ongoing qualms about working with Renka.  Palmer's alternative explanation is that she inquired about Carter's complaint because Palmer was "very new in this position" and because Palmer "wondered if this [complaint] meant that she should be given any special consideration." (Palmer Aff., ¶ 8.)  But how would asking Carter about the status of her internal complaint be at all helpful in addressing Palmer's uncertainty as to whether the existence of such a complaint entitled her to special consideration?  It wouldn't.  This explanation is a *non sequitur*, and a reasonable finder of fact could deem it implausible.

Furthermore, Palmer's stated reasons for not selecting Carter for the nursing position are riddled with question marks.  She states that Carter's file "just raised too many red flags." (Palmer Aff., ¶ 10.)  Wasn't the largest and most prominent of those "red flags" the fact that she had lodged an internal complaint of sexual harassment against a co-worker just three months earlier?  A reasonable jury could so find.  Additionally, Palmer's conclusion that "there was a bad pattern with Felicia that looked like it would not change" is difficult to reconcile with the fact that almost all of the file materials on which Palmer relies date back more than three years

---

past religious accommodation from his supervisors." 261 F.3d at 1264.  As such, the facts in *Pennington* bear no resemblance to those here, and the Eleventh Circuit's conclusion in *Pennington* that those statements in the second interview did not evince retaliatory animus neither dictates nor implies a similar result here.  Far from raising the subject in the context of explaining the need for a reinterview and assuring the applicant that its purpose was to avoid any bias or retaliation, Palmer spoke of Carter's sexual harassment complaint in an open-ended way that raised substantial questions as to whether she would weigh it in the challenged employment decision.  In short, *Pennington* is inapposite.

-19-

earlier.  The dearth of negative information in Carter's file dating after 2001 strongly suggests that any "bad pattern" involving her professionalism and attitude in interacting with parents had abated, else the Hospital would not have stopped documenting it.[27]  Palmer does not explain this inconsistency.

Nor are the Court's concerns assuaged by Palmer's explanation that the conduct issues recited in antiquated documents in Carter's personnel file were reinforced by Palmer's own observations of Carter in the workplace between 2002 and 2004.  Palmer states that she "had directly experienced instances where she had acted inappropriately toward parents or was complained about by parents."  (Palmer Aff., ¶ 11.)  If that were true, an obvious question is why Palmer would have expressed unbridled enthusiasm to rehire Carter before the interview, only to flip-flop after asking her about the complaint during the interview.  Another glaring question is why Palmer failed to document those instances of inappropriate behavior, as the Hospital had done when Carter had exhibited similar problems in the 1990s.  There were no recent warnings or writeups for attitude/ misconduct in her file, whether by Palmer or anyone else.  Carter was in no danger of losing her job.  Palmer attributes her inaction (and that of other managers) on this front to the fact that "[w]e had just learned to accept this behavior ... because we all agreed that her clinical skills were just fine."  (*Id.*)  But how can that statement be squared with Palmer's statement elsewhere in her affidavit that Carter's 1990s-era behavioral issues were of serious concern to her in 2005 because "at this time USA was making a big push for customer service"

---

[27]     Regarding the age of the materials on which Palmer purports to have relied, defendants offer two unconvincing responses.  First, defendants correctly point out that not all of the negative performance information in Carter's file was remote in time to this hiring decision.  But almost all of it was.  It is true that Carter received a verbal warning for tardiness in March 2004.  That infraction was nearly a year old in its own right, and was in any event trivial compared to the professionalism concerns stressed by Palmer's affidavit.  Palmer does not cite the March 2004 verbal warning as a significant factor, but instead appears to place far heavier weight on the older writeups concerning parental complaints.  Second, defendants protest that nothing in the Federal Rules of Evidence forbade Palmer from delving into the distant past in making her decision.  That may be true, but it misses the point.  The real issue is whether a reasonable juror might deem it pretextual for an employer to refuse to hire an applicant who had recently complained of sexual harassment, and to justify that decision based on hoary file materials dating back (with one minor exception) between three and ten years.  That question is answered affirmatively.

-20-

(Palmer Aff., ¶ 10.)?  If a "big push for customer service" were ongoing within the USA system, one might have expected Palmer and her fellow nurse managers and nurse supervisors to be less permissive and less tolerant of any instances of unprofessional conduct or poor attitude, yet Palmer says the truth was just the opposite, at least with respect to Carter.  It strains credulity to suggest, as Palmer does, that Hospital managers developed a lax approach toward Carter's behavioral transgressions at the same time that the USA health care system embraced a newfound emphasis on customer service.  On this record, a reasonable jury could conclude that there were no such behavioral issues with Carter within a reasonable time preceding the February 2005 hiring decision, and that Palmer's recitation of same as the reason for her hiring decision was pretextual.[28]

The qualifications of the successful applicant further advance plaintiff's cause in showing pretext.  Palmer filled the full-time nursing job by hiring a new graduate nurse, based on favorable word of mouth from one person.  (Palmer Aff., ¶ 13.)  That Palmer passed over Carter, a seasoned nurse with strong clinical skills and 13 years of experience in pediatrics at Children's & Women's, in favor of a newly minted nurse who was an unknown quantity with no experience raises a substantial question of pretext based on disparity of qualifications.[29]

---

[28]     To bolster Palmer's account, the Hospital states in its reply brief that Joyce Shannon (Carter's supervisor prior to November 2004) had compared notes with Palmer and had relayed concerns about Carter's behavior to Palmer at the time of the February 2005 hiring decision.  (Shannon Aff., ¶¶ 9,13.)  This attempt at corroboration is unavailing because (i) there is no evidence that Palmer afforded any consideration at all to Shannon's comments, and (ii) even if there were, Shannon's testimony about ongoing "behavioral concerns" with Carter suffers from the same credibility problems that Palmer's does.  If, as Shannon avers, "behavioral concerns are important, too" and if Carter's performance were giving rise to such concerns in late 2004, one might expect Shannon to have documented those concerns.  That Shannon apparently never did so, and instead signed off on generally favorable evaluations for Carter during that time period, raises significant questions as to whether those concerns legitimately existed.

[29]     To be clear, the Court recognizes that for a plaintiff to satisfy pretext based on relative qualifications alone, the "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 126 S.Ct. 1195, 1197, 163 L.Ed.2d 1053 (2006).  Here, however, Carter does not rely exclusively on the disparity in qualifications to show pretext.  For that reason, she need not

To combat Carter's evidence of pretext, defendants "do most emphatically argue" that plaintiff's evidence of discriminatory intent is "so very weak" that summary judgment should be granted anyway.  (Reply Brief, at 9.)  Of course, the law is clear that "in the *usual* case, rejection of the reasons offered by the defendant, combined with the evidence supporting the prima facie case, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1185-86 (11th Cir. 2005) (citations omitted).  Defendants maintain that this is an unusual case because, as provided for in *Ledbetter*, "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  421 F.3d at 1185-86 n.20 (citation omitted).  The critical evidence here concerns Palmer's queries to Carter during the job interview and Palmer's articulated reasons for her nonhiring decision.  Contrary to defendants' characterization, the myriad inconsistencies, weaknesses and implausibilities generated by that line of inquiry, and by the stated reasons for Carter's non-selection, raise a significant issue of fact, and there is no abundant, uncontroverted independent evidence to the contrary.[30]  The fact remains that Palmer embarked on an

---

satisfy the rigorous *Ash* threshold, but rather may have her evidence of the disparity weighed alongside her other pretext evidence, as documented *supra*.  *See Vessels*, 408 F.3d at 772 ("where the qualifications disparity is not the sole basis for arguing pretext, the disparity need not be so dramatic to support an inference of pretext").

[30]      On this score, defendants tout their "strong, well-publicized written policies against retaliation" and "their training on USA's anti-discrimination and retaliation policies." (Reply Brief, at 10.)  But defendants do not back up these conclusory allegations with evidence that the Hospital conducts meaningful training on retaliation, instead relying solely on affidavits saying that the Hospital addresses sexual harassment during employee orientation, that Buerger warned Renka (but no one else) to refrain from retaliating against Carter, and that Hospital nurse managers are trained in unspecified ways to take harassment complaints seriously.  (Reply Brief, at 10 n.8.)  None of this evidence suggests that the Hospital conducts any systematic, ongoing training to prevent retaliation against employees who have complained of harassment.  To the contrary, Palmer (the decisionmaker in this case) acknowledged her ignorance during the relevant time frame "about the impact, if any, [Carter's] pending complaint against [Renka] might have on the application process." (Palmer Aff., ¶ 8.)  If training on USA's retaliation policies is so prevalent, then why did Palmer not know what weight to give Carter's sexual harassment complaint in making her hiring decision?  Why did Palmer not know to avoid asking interview questions that might be perceived as retaliatory?  Palmer's uninformed state, coupled

impermissible, inappropriate line of inquiry while interviewing Carter.  The proffered explanations for that line of inquiry are unsatisfying and downright puzzling in many respects, such that a reasonable factfinder might deem them unworthy of credence.  This is not a close case, and the exceptions identified in *Ledbetter* to the usual rules for pretext determinations have no application here.

In sum, "[t]he heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998). Upon careful review of the summary judgment record, construing all inferences in the light most favorable to Carter, the Court is left with many lingering doubts as to whether the employer really was motivated by the proffered reasons for not selecting Carter for the full-time nurse job in February 2005.  Plaintiff has satisfied her pretext burden.

>    5.    *Mixed-Motive Defense.*

In a last-ditch effort to claim summary judgment on the Title VII retaliation cause of action, defendants invoke the mixed-motive defense.  Although the Civil Rights Act of 1991 rolled back many aspects of this defense, it remains available in the Title VII retaliation context. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001) ("we hold that the mixed-motive defense remains good law ... with respect to [plaintiff's] Title VII retaliation claim").  To prevail on this affirmative defense and avoid liability for Title VII retaliation, an employer must prove "by the preponderance of the evidence that the decision would have been made the same in the absence of discrimination."  *Steger v. General Elec. Co.*, 318 F.3d 1066, 1075 (11th Cir. 2003); *see also Pulliam v. Tallapoosa County Jail*, 185 F.3d 1182, 1184 (11th Cir. 1999) ("Defendants in [discrimination] cases may prove as an affirmative defense that they would have reached the same employment decision even in the absence of bias.").  For the reasons stated above in the Court's discussion on pretext, there are obvious, glaring issues of material fact as to whether the Hospital would have passed over Carter for hire in the absence of any retaliatory motive.  For that reason, the Hospital's request for summary judgment on its

---

with the paucity of evidence that the Hospital conducted any anti-retaliation training, undermines defendants' bald representation of widespread training on this topic.

affirmative defense is **denied**.[31]

## IV.    Plaintiff's Claims against Renka.

The Court now turns to the three state-law claims brought by Carter against defendant Mike Renka, including causes of action for invasion of privacy, outrage and assault and battery. Renka seeks summary judgment on each of those claims.

### A.      *Invasion of Privacy / Outrage.*

Plaintiff's invasion of privacy and outrage claims are not actionable, as a matter of law. In a very recent opinion, the Eleventh Circuit explained that "a plaintiff in Alabama must show that the defendant's conduct was so outrageous that it caused the plaintiff mental suffering, shame, or humiliation (for invasion of privacy) or that it cannot be tolerated in a civilized society (for intentional infliction)."  *Baldwin v. Blue Cross/Blue Shield of Alabama*, --- F.3d ----, 2007 WL 805528, *19 (11th Cir. March 19, 2007).  In *Baldwin*, the plaintiff presented evidence that her supervisor had routinely used sexually laced profanity in the office; that he had propositioned her to spend the night in his hotel room; that he often called her "babe"; that on one occasion he closed the door to his office, came up behind her and asked her to perform oral sex on him; that he would walk up behind her and breathe on her neck; and that he unzipped his fly in her presence and moved the zipper up and down, all of which the plaintiff found offensive and all of which caused her discomfort.  Notwithstanding this evidence of egregious misconduct, the Eleventh Circuit concluded in *Baldwin* that there was no genuine issue of material fact as to either the invasion of privacy or the outrage causes of action.  As that court explained, "[a]ssuming that [the supervisor] did everything that [the plaintiff] said he did, his harassment of [the plaintiff] was not sufficiently outrageous as a matter of Alabama law" to sustain outrage or

---

[31]      Again, the Hospital relies on *Pennington*, wherein the Eleventh Circuit upheld the grant of summary judgment to the employer on a mixed-motive theory.  In *Pennington*, however, the court found that the chain of causation was broken where a decision maker conducted his own evaluation and made his own independent decision, free of the taint of a biased subordinate. 261 F.3d at 1270-71.  No such circumstances obtain here, inasmuch as the final decisionmaker is the very employee as to whom plaintiff's evidence creates genuine issues of bias.

invasion of privacy claims.  *Id.* at *19.[32]

If the *Baldwin* supervisor's conduct does not amount to outrage or invasion of privacy under Alabama law, then neither does that of Renka, whose acts of rubbing against plaintiff as he walked by on a single occasion, bringing her candy, inviting her to take an elevator ride, and asking her if she wanted to come down and "fool around," are positively tepid by comparison to those at issue in *Baldwin*.  Accordingly, defendants' Motion for Summary Judgment is due to be **granted** with respect to the invasion of privacy and intentional infliction of emotional distress causes of action.

### B.      Assault and Battery.

Finally, the Court considers Renka's request for summary judgment on the assault and battery cause of action.  To prove such a claim, the plaintiff must establish the following: "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner."  *Harper v. Winston County*, 892 So.2d 346, 353 (Ala. 2004); *Ex parte Atmore Community Hosp.*, 719 So.2d 1190, 1194 (Ala. 1998).  Under Alabama law, an assault is an intentional, unlawful offer to touch the person of another in a rude or angry manner under circumstances that create in the mind of the party alleging the assault a well-founded fear of imminent battery, coupled with the apparent present ability to effectuate the attempt.  *See Wood v. Cowart Enterprises, Inc.*, 809 So.2d 835, 837 (Ala.Civ.App. 2001).  "A successful assault becomes a battery, which consists of the touching of another in a hostile manner."  *Wright v. Wright*, 654 So.2d 542, 544 (Ala.1995) (citations omitted).  A key element of the tort of battery is that "the touching was conducted in a

---

[32]      The *Baldwin* panel found support for this result in *McIsaac v. WZEW-FM Corp.*, 495 So.2d 649 (Ala. 1986).  In *McIsaac*, the plaintiff alleged invasion of privacy and outrage claims after the owner of the business where she worked took her to lunch, repeatedly pressured her to have an affair with him, attempted to kiss her, touched her arm, put his arm around her, leered at her, and the like.  The *McIsaac* court deemed the outrage claim not cognizable because, in the light most favorable to the plaintiff, the conduct in question constituted "mere insults, indignities, threats or annoyances" which cannot give rise to tort liability.  495 So.2d at 651.  With respect to invasion of privacy, *McIsaac* concluded that this type of intrusion and examination into the plaintiff's privacy concerns fell short of that required.  *Id.* at 652 ("Even the dire affront of inviting an unwilling woman to illicit intercourse has been held by most courts to be no such outrage as to lead to liability" for invasion of privacy).

harmful or offensive manner." *Atmore Community Hosp.*, 719 So.2d at 1194.  Alabama courts have found substantial evidence of battery where a co-employee touched the plaintiff intentionally, and in a manner that had sexual overtones and was unwelcome.  *Id.* (involving allegations that defendant, *inter alia*, rubbed against plaintiff when passing her in the hall).

Defendants argue that "[c]learly the single incident of brief 'brushing' by Renka cannot establish this serious claim."  (Defendants' Brief, at 30.)  The Court cannot agree.  In the light most favorable to Carter, the evidence is that after Renka repeatedly propositioned her by inviting her to come downstairs to "fool around," he rubbed – not brushed, but rubbed – his pelvic area against her buttocks on one occasion for several seconds in a manner that Carter perceived to be hostile and offensive.  At a bare minimum, this creates a jury question as to whether Renka intentionally touched Carter in an offensive manner that had sexual overtones and was unwelcome.

Undaunted, defendants liken this case to *Morrow v. Auburn University at Montgomery*, 973 F. Supp. 1392 (M.D. Ala. 1997), wherein the plaintiff alleged that her supervisor had attempted to step on her "little white tennis shoes" in a "cutesie" manner, that he had patted her with a ruler in public, and that he had rubbed the back of her neck in front of students, with no element of offensiveness or threats.  On that basis, the district court found no evidence that defendant's conduct was intended to create a well-founded apprehension of imminent harm, entitling the defendant to summary judgment on the assault claim.  *Id.* at 1409.  *Morrow* is distinguishable from this case because in *Morrow*, there was no battery claim and no allegation of sexually inappropriate comments by the defendant.  In the Court's view, the case at bar is much closer to *Saville v. Houston County Healthcare Authority*, 852 F. Supp. 1512 (M.D. Ala. 1994), wherein the district court denied summary judgment on a state-law assault and battery claim where the defendant was alleged to have grabbed the plaintiff's buttocks after previously making sexually harassing statements to her.  The *Saville* court found genuine issues of material fact as to whether the touching was conducted in a hostile manner (as the plaintiff contended) or in a joking or teasing manner (as the defendant contended), precluding summary judgment on the assault and battery theory.  *Id.* at 1542.  This case is sufficiently akin to the facts in *Saville* to create a jury question as to whether the elements of the Alabama tort of battery have been satisfied.  For that reason, summary judgment is **denied** on the assault and battery cause of

action.

**V.     Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** that defendants' Motion for

Summary Judgment (doc. 44) is **granted in part, and denied in part**.  The Motion is **granted**

with respect to plaintiff's Title VII sexual harassment and sex discrimination claim against the

Hospital, and plaintiff's state-law claims of invasion of privacy and outrage against Renka.

Those claims are **dismissed with prejudice**.  The Motion is **denied** as to plaintiff's Title VII

retaliation claim against the Hospital and her state-law assault and battery claim against Renka.

Those claims will proceed to trial.

DONE and ORDERED this 26th day of March, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE